**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **LORRAINE LOPEZ**<br>Edison, New Jersey 08820,<br><br>*Plaintiff,*<br><br>v.<br><br>**AT&T, INC. d/b/a "AT&T"**<br>208 South Akard Street<br>Dallas, TX 75202,<br><br>**AT&T MOBILITY SERVICES LLC d/b/a "AT&T"**<br>208 South Akard Street<br>Dallas, TX 75202,<br><br>and<br><br>**JOHN STANKEY,**<br>Dallas, TX,<br><br>                  *Defendants.* | **CIVIL ACTION NO.:** _____<br><br><br><br><br><br>**JURY TRIAL DEMANDED**<br><br><br><br>**COMPLAINT** |

## I.   **INTRODUCTION**

AT&T's CEO John Stankey introduced the company's *How and Where We Work Initiative* with the expectation that it would eliminate thousands of older managers.  CEO Stankey told everyone in July, 2023 that AT&T **needed younger people** working at the company and that the initiative was an opportunity to "say goodbye" to the older managers and build the "next generation" of "future" leaders.  In September, 2023, Stankey – just three and half years older than Plaintiff -- appeared before her and others at an Open-Mic night in one of AT&T's New Jersey offices and praised the "young" employees, while lamenting that he was an "old guy" with "a lot of gray hair" who was "not going to work much longer…"  CEO Stankey followed up his visit with a LinkedIn post praising the "young minds helping shape the future" of the company.

AT&T did nothing to remediate its CEO's instruction to discriminate against older employees and the hostility he expressed toward them. On the contrary, the company reinforced the brazen age bias. For example, during the week before AT&T notified Plaintiff of her "surplus"/termination, CEO Stankey visited AT&T employees in New Jersey, which AT&T described as a "great opportunity to build connections and celebrate the work being done by the young professionals who will lead future innovations at AT&T." In fact, AT&T in this case admitted to the EEOC that CEO Stankey supported "AT&T's efforts to attract and foster the development of younger employees…"

Plaintiff, Lorraine Lopez, worked for AT&T in New Jersey for approximately thirty (30) years. In January 2024, her annual performance evaluation was "Exceeds." But Plaintiff was not a "young talent" and when the CEO of the company speaks, everyone at the company listens. Even though Plaintiff's work was consistently outstanding and her work location in Bedminster, New Jersey had been identified as a "core" worksite less than a year earlier, AT&T in April, 2024, did what its CEO had instructed: It used the *How and Where We Work* initiative to "offer" Plaintiff (then 58) a forced relocation at her own expense to a disadvantageous location and when she declined, as intended, AT&T on June 25, 2024, notified Plaintiff of her selection for "surplus" and terminated her employment effective July 9, 2024.

AT&T treated Plaintiff less favorably than substantially younger colleagues. The company, among other things, subjected Plaintiff to a continuing hostile work environment, transferred her to a disadvantageous location, offered no reimbursement for relocation expenses, and terminated her employment because of her age. CEO Stankey aided and abetted the unlawful discrimination. Plaintiff now brings this action against defendants AT&T, Inc. d/b/a "AT&T" and AT&T Mobility Services, LLC d/b/a "AT&T" for violation of the Age Discrimination in

2

Employment Act, as amended, 29 U.S.C. § 621, *et seq.* ("ADEA") and the New Jersey Law Against Discrimination, as amended, N.J.S.A. § 10:5-1, *et seq.* ("NJLAD").  Plaintiff brings this action against defendant John Stankey for aiding and abetting AT&T's age discrimination in violation of the NJLAD.

Plaintiff seeks damages, including economic loss, compensatory damages for pain and suffering, liquidated damages, punitive damages, attorney's fees and costs, and all other legal and equitable relief that this Court deems appropriate.

## II.    **PARTIES**

1.     Plaintiff, Lorraine Lopez, is an individual and a citizen of the state of New Jersey. She resides in Edison, New Jersey, 08820.

2.     Plaintiff was born in March, 1966, and was fifty-eight (58) years of age as of the effective date of her involuntary termination from AT&T on July 9, 2024.

3.      Defendant AT&T, Inc. d/b/a "AT&T" is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business located at 208 South Ackard Street, Dallas, Texas, 75202.

4.     Defendant AT&T, Inc. d/b/a "AT&T" is the parent company of several wholly-owned and controlled subsidiary corporations through which it does business, including Defendant AT&T Mobility Services, LLC d/b/a "AT&T."

5.     Defendant AT&T, Inc. d/b/a "AT&T" is the "alter ego" of its various controlled and wholly owned subsidiary companies, including Defendant AT&T Mobility Services LLC d/b/a "AT&T."

6.     Defendant AT&T Mobility Services LLC d/b/a "AT&T" is a Delaware limited liability company, with a principal place of business in Dallas, Texas.

7.      Defendant AT&T Mobility Services LLC d/b/a "AT&T" shared with Defendant AT&T, Inc. d/b/a "AT&T," *inter alia*, common personnel policies and employment practices.

8.      Defendants AT&T, Inc. d/b/a "AT&T" and AT&T Mobility Services LLC d/b/a "AT&T" hold themselves out to the public and their employees as part of an interconnected AT&T "family of companies" known as "AT&T" which, together and as one entity, employs more than 100,000 people in the United States.

9.      Defendants AT&T, Inc. d/b/a "AT&T" and AT&T Mobility Services LLC d/b/a "AT&T" acted as joint employers, sharing common ownership, personnel policies, procedures, and employment practices.

10.     Defendants AT&T Mobility Services LLC d/b/a "AT&T" and AT&T, Inc. d/b/a "AT&T" jointly employed Plaintiff.

11.     Defendants AT&T, Inc. d/b/a "AT&T" and AT&T Mobility Services LLC d/b/a "AT&T" for purposes of Plaintiff's employment are interconnected such that they are considered a "single" and/or "integrated" employer and/or enterprise.

12.     Defendants AT&T Mobility Services LLC d/b/a "AT&T" and AT&T, Inc. d/b/a "AT&T" are referred to collectively hereinafter as "AT&T."

13.     AT&T acted by and through their authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with AT&T in furtherance of AT&T's  business.

14.     AT&T employed more than twenty (20) people.

15.     AT&T acted as an employer within the meaning of the ADEA, as amended,  29 U.S.C. § 621 *et seq.*, and the NJLAD, § 10:5-1 *et seq.*

16.     Plaintiff was an employee of AT&T within the meaning of the ADEA and the NJLAD.

17.     Plaintiff worked for AT&T in the state of New Jersey.

18.     Upon information and belief, defendant John Stankey is an individual residing in Dallas, Texas.

19.     CEO Stankey began his career with AT&T in 1985. According to an April 4, 2023 AT&T SEC filing, CEO Stankey had at that time "more than 35 years of experience spanning nearly every area of AT&T's business, which has provided him with intimate knowledge of [the] Company, values and culture."

20.     CEO Stankey has had a great personal economic interest in AT&T. Without limitation, for the fiscal year that ended December 31, 2024, CEO Stankey received approximately $26+ million in total compensation.

21.     AT&T's facilities, operations and employees in New Jersey have been essential to the company's success and have contributed significantly to AT&T's earnings and, in turn, to CEO Stankey's compensation.

## III.    **JURISDICTION AND VENUE**

22.     The causes of action alleged in this matter arise under the ADEA and the NJLAD.

23.     The District Court has subject matter jurisdiction over Count I (ADEA) pursuant to 29 U.S.C. § 626(c) and 28 U.S.C. §1331.

24.     The District Court has supplemental subject matter jurisdiction over Count II (NJLAD) pursuant to 28 U.S.C. § 1367 because Plaintiff's NJLAD claims arise from the same case or controversy as his ADEA claims.

25.     The District Court also has subject matter jurisdiction over all Counts pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interests and costs, and there is complete diversity of citizenship as Plaintiff is a citizen of New Jersey and Defendants are not.

26.     Defendant AT&T Mobility Services LLC  d/b/a "AT&T" is subject to the personal jurisdiction of this Court because, without limitation, it purposefully avails itself of the benefits of the state of New Jersey, it engages in continuous and systematic contacts such that it is at home in the state of New Jersey, it directed, committed and/or foresaw the injuries to Plaintiff occurring in the state of New Jersey, and/or Plaintiff's claims against it arise from or are related to its contacts in the state of New Jersey.

27.     Defendant AT&T, Inc. d/b/a/ "AT&T" is subject to the personal jurisdiction of this Court because, without limitation, it purposefully avails itself of the benefits of the state of New Jersey, it engages in continuous and systematic contacts such that it is at home in the state of New Jersey, it directed, committed and/or foresaw the injuries to Plaintiff occurring in the state of New Jersey, and/or Plaintiff's claims against it arise from or are related to its contacts in the state of New Jersey.

28.     Defendant John Stankey is subject to the personal jurisdiction of this Court because, without limitation, he purposefully availed himself of the benefits of the state of New Jersey, he directed, committed and/or foresaw the injuries to Plaintiff occurring in the state of New Jersey, and/or Plaintiff's claims arising against him under the NJLAD are related to his contacts in the state of New Jersey.  Among other things, and as is alleged herein:

> a.     In his position as CEO and with his intimate knowledge of AT&T, CEO Stankey would have been aware and intended that his statements to AT&T managers that the company needed younger employees and that they should use the *How and Where We Work* initiative as a vehicle to discriminate

against older employees would be heard by managers working in New Jersey and by managers with subordinates working in New Jersey, and would infect with age bias the decision-making process in connection with the *How and Where We Work* initiative.

b.    Plaintiff was present at work in New Jersey when she heard Stankey's brazen statements against older employees during the interactive Town Hall to which managers were invited to participate.   In his position as CEO and with his intimate knowledge of AT&T, CEO Stankey would have been aware that his statements would reach managers working in New Jersey and that the message would be extremely upsetting to them.

c.    CEO Stankey openly championed AT&T's preference for "young talent," including through AT&T's Development Programs, one of which had a "hub" in New Jersey.

d.    CEO Stankey was physically present at AT&T's offices in New Jersey on multiple occasions during 2023 and 2024.

e.    Stankey's visits to AT&T's New Jersey offices  contributed to the age-based hostile work environment.  Without limitation:

   i.    On September 18, 2023, CEO Stankey (then 61 – about three and half years older than Plaintiff) spoke at an Open-Mic event in Middletown, New Jersey, which Plaintiff attended.  CEO Stankey stated:

   We could have a not so durable relationship with the shareholder, which is better than today.  What would it be?  Anybody want to guess?  I'm an old guy, a lot of gray hair, not going to be in this job 10 years.  You're all young.  You look wonderful.  I can see you all out there.  You're going to be in your jobs a long time.  You want this business to be around.  You want a good place to come and work and apply your skills and abilities.  You care about durability.  I'm an old guy.  I'm not going to work much longer….

   ii.    Stankey visited AT&T in New Jersey office on or about the week before June 24, 2024.  On June 24, 2024, AT&T posted about CEO Stankey's visit with members of its Technology Development Program in New Jersey:  "The day was a great opportunity to build connections and celebrate the work being

7

done by the young professionals who will lead
future innovations at AT&T."

    f.    CEO Stankey was involved in and benefited from the presentation to Plaintiff in New Jersey of a fraudulent "General Release" of all claims, including against CEO Stankey, arising from Plaintiff's work in New Jersey, including claims of age discrimination under New Jersey law.

29.    Venue is proper in the District Court under 28 U.S.C. §1391(b) because, without limitation, a substantial part of the events giving rise to the claims alleged herein occurred within this judicial district and/or Defendants conduct business in this district.

30.    On or about August 15, 2024, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") complaining of the age discrimination in violation of the ADEA as alleged herein. Attached hereto, incorporated herein, and marked as Exhibit 1 is a true and correct copy of the EEOC Charge of Discrimination (with minor redactions for purposes of electronic filing of confidential/identifying information).

31.    More than sixty days have passed since Plaintiff filed her EEOC Charge.

32.    On or about January 21, 2026, the EEOC issued to Plaintiff a Notice of Right To Sue on her EEOC Charge.

33.    This Complaint has been timely filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue on her claims arising under the ADEA.

34.    Plaintiff has fully complied with all administrative prerequisites for the commencement of this action on her claims arising under the ADEA.

35.    This Complaint has been timely filed in connection with Plaintiff's claims arising under the NJLAD.

**IV.    FACTUAL ALLEGATIONS GIVING RISE TO PLAINTIFF'S CLAIMS**

    **A.    AT&T's Systemic Age Bias And Pattern Or Practice Of Age Discrimination.**

8

36.    For many years, and during which time CEO Stankey held a senior leadership position, AT&T has engaged in a pattern or practice of age discrimination against its older employees.  Without limitation, *e.g.*:

    a.  AT&T has a corporate culture of age discrimination.

    b.  AT&T has encouraged and incentivized older employees to voluntarily leave the workforce.

    c.  AT&T's Modified Rule of 75 ("MR75," based on age and years of service) has been considered as a factor in personnel decisions and is understood as an incentive for older employees to leave the AT&T workforce and a basis of an assumption that they would do so.

    d.  AT&T for years has promoted age-biased Employee Work Groups ("ERGS") and has encouraged its employees to participate in them.

        i.  In 2011, AT&T founded an Employee Work Group entitled "OxyGEN, Young Professionals of AT&T," whose stated mission is "[t]o attract, develop and retain future leaders of AT&T."

        ii.  In 2014, AT&T launched "50 & Forward AT&T Professionals Over 50," whose stated mission was:

> To support an age-diverse workforce and ways to optimize it; to prepare an age-diverse workforce for technological and cultural changes in the workplace; to contribute to the professional development of all AT&T employees in an age-diverse workforce; to support a generation of young leaders at AT&T; and to promote AT&T as a leading employer of individuals of all ages.

        Among its initiatives was "Workforce 2020:  Better Together' initiative for preparing younger managers to lead an aging workforce."

    e.  For years, AT&T published annual Diversity & Inclusion Reports which provided information on its workforce as broken down by, *e.g.,* generations (such as "Traditionalists," "Baby Boomers," "Generation X," "Generations Y," and "Generation Z").

    f.  AT&T at the highest levels has publicly expressed its displeasure at having an aging workforce, its intention to transform the company for the "future," and its desire and expectation that older workers will leave its workforce.  Without limitation:

      i. In 2016, AT&T's then Chief Executive Officer, Randall Stephenson, publicly discussed that AT&T has an aging workforce and had a need to reinvent the company. *See Gearing Up for the Cloud, AT&T Tells Its Workers: Adapt or Else,* http://www.nytimes.com, February 13, 2016.

      ii. In a 2016 article entitled "AT&T Talent Overhaul", an Executive Officer of AT&T (John Donovan) noted that "AT&T employs about 280,000 people, most of whom got their education and foundational job training in a different era" and that the average tenure at the company is 22 years and that most of AT&T employees were educated and trained "in a different era." In these same comments, Mr. Donovan noted that AT&T has redesigned its "practice" by, among other things, redesigning compensation so that it "de-emphasized seniority."

      iii. Since replacing Randall Stephenson in 2020, CEO John Stankey has expressed outrageously offensive ageist statements and promoted even more explicitly AT&T's policy of age discrimination.

g. AT&T's website section on Corporate Responsibility has a Human Capital Management document that boasts of "nearly 20 internship and developmental programs to provide outstanding young individuals with real-world experience in, and pathways to, careers in telecommunications."

h. AT&T has various Leadership Development Programs aimed to recruit and retain young individuals as the future leaders of the company, including, without limitation, a Technology Development Program ("TDP") and Financial Leadership Development Program ("FLDP").

i. Young graduates of the Leadership Development Programs are given preferential treatment with the purpose and intent of developing them into future leaders.

j. AT&T has <u>admitted</u> to the EEOC in this case that CEO Stankey supported "AT&T's efforts to attract and foster the development of younger employees to capitalize on their perspectives and diversity of thought…"

      i. It is an ageist stereotype to assume that employees would have "diversity of thought" – *i.e.*, think in certain ways—because of their age.

k. Courts within the Third Circuit have found that AT&T has violated the anti-discrimination laws and engaged in age discrimination. Without limitation:

      i. In December, 2016, a jury sitting in the Eastern District of Pennsylvania found that former AT&T employee John Gerundo proved that his age was the determining factor in AT&T's decision to surplus his employment in connection with a reduction in force in violation of the ADEA and PHRA.

*See generally Gerundo v. AT&T Servs.*, No. 2:14-cv-5171, 2016 U.S. Dist. LEXIS 177583 (E.D. Pa. Dec. 21, 2016)(denying AT&T's post-trial motion for judgment as a matter of law, and upholding the jury's verdict).

ii. On January 11, 2019, the United States Court for the Eastern District of Pennsylvania found that the General Release and Waiver Agreement AT&T presented to older employees who had been "surplussed" and then involuntarily terminated violated the ADEA, as amended by the Older Workers Benefits Protection Act ("OWBPA"). *Ray v. AT&T Inc.*, No. 2:18-cv-03303, 2019 U.S. Dist. LEXIS 5638 (E.D. Pa. Jan. 11, 2019).

iii. On November 19, 2021, a jury sitting in the Eastern District of Pennsylvania unanimously found that AT&T's age discrimination drove its decision to terminate its former employee, Alison Ray, and that AT&T acted willfully, that is, AT&T knew, or recklessly disregarded whether, firing Ray was unlawful. In addressing AT&T's post-trial motion, the Court wrote that the jury's verdict constituted a "powerful condemnation of AT&T's treatment of Ray, and repudiated AT&T's claim that her firing was a business decision unrelated to age." *Ray v. AT&T, Inc.,* 2022 U.S. Dist. LEXIS 30817, *2 (E.D. Pa. Feb. 22, 2022).

l. AT&T has been subject to many age discrimination lawsuits alleging age discrimination and an intentional effort by AT&T to use the "surplus/termination" process to eliminate its older employees and replace them with younger ones. By way of example only, and without limitation.:

- *Gerundo v. AT&T* (*supra*, jury verdict in favor of plaintiff);
- *Ray v. AT&T* (*supra*, jury verdict in favor of plaintiff);
- *Dolenti v. AT&T*, E.D. Pa. 2:18-cv-5077 (settled; Local R. 41.1(b) dismissal);
- *Kantz v. AT&T, Inc. et al.*, E.D. Pa. 2:20-cv-00531 (settled; Local R. 41.1(b) dismissal);
- *Minguez v. AT&T Corp., et al.*, D.N.J 3:24-cv-09069 (pending); and
- *Hurley v. AT&T Corp., et al.*, E.D. Pa. 3:25-cv-01755 (pending).

m. The full extent of employees who believe that AT&T "surplussed" and terminated their employment because of age cannot be fully ascertained because, without limitation: a) AT&T has presented intentionally false and misleading data to the surplussed/terminated employees to conceal its age discriminatory intent while intentionally and falsely telling them that if they sign the "General Release" in order to receive severance they will have waived their right to sue for violation of the ADEA; b) AT&T forces many employees into a private arbitration program in which the employee is bound

11

unless they affirmatively opt out; and c) the General Release and the arbitration agreement contain collective action waivers.

n.  Defendants have intentionally flouted the Court's Order and Opinion issued in *Ray v. AT&T* and have continued to present to employees (including to its employees working in New Jersey and, in particular, to Plaintiff here) what falsely purports to be a "General Release" of all claims, including under the ADEA, that is invalid and unenforceable under the ADEA because it was accompanied by misleading informational disclosures intended to mask evidence of age discrimination.

    i.  The Court in *Ray* entered partial summary judgment against AT&T on the grounds that the "General Release" it presented to surplussed/terminated employee Alison Ray violated the OWBPA and was unenforceable because it failed to define the decisional unit in a way that was understandable.  The Court explained that "decisional unit is intended to reflect the employer's process in selecting employees for the reduction-in-force."  The court cautioned: "Because 'it is certainly possible that an employer will want to fiddle with the definition [of the decisional unit] to mask the possible evidence of age discrimination," in interpreting the requirements of this section of the statute, the 'touchstone should be the 'understandable to the average worker' standard.'" *Ray v. AT&T, Inc.*, 2019 U.S. Dist. LEXIS 5638, *11.

    ii.  Since it was invalidated, AT&T's General Release with accompanying OWBPA disclosures has been the subject of extensive litigation, such that AT&T and CEO Stankey would have been aware that the General Release presented to Plaintiff in this case was not a valid and enforceable release of claims under the ADEA.

    iii.  In light of his position of ultimate responsibility, CEO Stankey would have approved, authorized and/or directed the form General Release with accompanying OWBPA disclosures presented to Plaintiff and other New Jersey employees which, as indicated on their face, were amended in 2022.

37.  AT&T, and CEO Stankey in his position, would have been aware of the complaints and findings of age discrimination, but have taken no steps to eliminate or remediate the company's age bias and discrimination or to protect against it.  The reasonable inference is that it is intentional.

**B.**    **<u>AT&T Discriminated Against Plaintiff Because Of Her Age.</u>**

38.     Plaintiff was born in March, 1966.

39.     Plaintiff is hard-working and highly educated, and was a valuable contributor to AT&T for approximately thirty (30) years.

40.     Plaintiff, while working, earned an Associates Degree in Liberal Arts from Middlesex County College, a B.A. in English from Kean College (now Kean University), and an M.B.A. from Kean.

41.     Plaintiff was initially hired by AT&T as a clerk in 1987 and worked for the company until 1996, when she left voluntarily for a competitor communications company (where she attained the position of VP of Broadband Operations).

42.     Plaintiff at age 37 was recruited back by AT&T in 2003 at age 37,  and made a Level 3 Director in 2004.

43.     At the time of her involuntary termination effective July 9, 2024, Plaintiff held the position of Director, Sourcing Operations.

44.     Plaintiff began her position as Director, Sourcing Operation in approximately April 1, 2022, reporting to George Meadors, with whom she had worked as a Director since 2007.

45.     Plaintiff worked in AT&T's Bedminster, New Jersey office.

46.     Plaintiff was qualified for the Director, Sourcing Operations position and consistently performed her job duties in a highly competent manner and received positive feedback.

### 1.     AT&T Subjected Plaintiff To A Continuing Hostile Work Environment Because Of Her Age.

47.     AT&T subjected Plaintiff to a continuing age-based hostile work environment that culminated in her termination effective July 9, 2024.

48.    AT&T at the highest level openly expressed hostility towards its older employees and its preference for younger employees.

49.    It was common knowledge and openly discussed among employees that CEO Stankey was age biased.

50.    Brazen ageist remarks were attributed to CEO Stankey and they were tolerated. For example, and without limitation, Plaintiff and many others heard CEO Stankey make a comment to the effect that AT&T does not need people who know how to use an abacus.

51.    In May, 2023, AT&T CEO Stankey expressed in thinly veiled age-biased language his expectation that a newly announced *How and Where We Work Initiative,* which coupled a consolidation of work locations and a return to the office requirement, would result in the elimination of about 9,000 managers and that most of them would be older. Stankey stated, among other things: "If they want to be a part of building a great culture and environment they'll come along on these adjustments and changes. Others may decide, given the station of life they are in, that they want to move in another direction."

52.    On July 26, 2023, CEO Stankey, Jeff McElfresh (AT&T COO), Pascal Desroches (AT&T CFO), Melissa Arnoldi (head of AT&T Customer Operations), and Krista Pilot (AT&T's Chief Communications Officer) participated in an interactive webcast "Town Hall" to which all AT&T employees were notified and encouraged to attend during work hours.

53.    Plaintiff, while working in AT&T's Bedminster office, signed in as a participant in the webcast Town Hall.

54.    In response to a question about the *How and Where We Work* initiative and losing people with experience, Plaintiff heard Mr. Stankey explain as follows:

> And we have a mathematical issue that **we have to deal with in our company. The profile of our workforce does not match the**

14

**profile of the population of the United States and the customer base, both in terms of matching it demographically and matching it from an age perspective. We need younger people working at this company** because that is the largest market now starting to mature into decision making levels and we need people around to help educate us about how they think and what they do and they need to be germane to what we do every day in running our companies**. So this is an <u>opportunity</u> for us to think about, <u>yeah, it's hard to say goodbye to that, which we know and really well-trained people who've had a lot of experience.</u> It can be emotional. <u>But it's also a great opportunity</u> for us to develop different points of view and <u>build the next generation that's going to ultimately carry this durable business forward in the future</u>.** (Emphasis added.)

55. CEO Stankey's remarks were extremely offensive and upsetting to Plaintiff and many older workers.

56. To Plaintiff's knowledge, AT&T did nothing to remediate Stankey's brazen age biased statements. Without limitation:

   a. None of the AT&T officers who spoke at the Town Hall expressed any disagreement or outrage at CEO Stankey's words.

   b. Many participants complained about CEO Stankey's remarks as openly expressing an intent to and/or admission of unlawful age discrimination by AT&T.

   c. Following the webcast, AT&T posted a message from CEO Stankey on AT&T Inside, its intracompany website. The Stankey follow-up message did not try to explain or take back his remarks.

   d. AT&T made no announcement that CEO Stankey's remarks were inappropriate.

   e. AT&T offered no apology to older workers as a result of CEO Stankey's comments.

   f. Following the webcast, Plaintiff and the other participants received a follow-up survey. AT&T received complaints about CEO Stankey's statements in response to the survey.

g. To Plaintiff's knowledge, AT&T took no remedial action to address any complaints regarding CEO Stankey's brazen statements.

57. On or about July 28, 2023, CEO Stankey announced the resignation of Angela Santone, the head of Human Resources. Among other things, CEO Stankey praised her in a memo to all employees for her "passion for mentoring young people."

58. In or about Summer, 2023, Stankey on his LinkedIn page posted: "Young professionals today are more likely to move around to a variety of jobs, working on a variety of projects in a variety of places."

a. CEO Stankey's expression echoes what he said in May, 2023, about the *How and Where We Work* initiative: AT&T's understanding and intent that, in contrast, older professionals are less likely to move around and, if forced to relocate, would likely retire or opt for a surplus/severance package instead.

59. On September 18, 2023, CEO Stankey (then 61 – about three and half years older than Plaintiff) spoke at an Open-Mic event during work hours in Middletown, New Jersey, which Plaintiff attended. CEO Stankey stated:

> We could have a not so durable relationship with the shareholder, which is better than today. What would it be? Anybody want to guess? I'm an old guy, a lot of gray hair, not going to be in this job 10 years. You're all young. You look wonderful. I can see you all out there. You're going to be in your jobs a long time. You want this business to be around. You want a good place to come and work and apply your skills and abilities. You care about durability.
> I'm an old guy. I'm not going to work much longer….

60. CEO Stankey posted about the visit on his LinkedIn page. He wrote, in relevant part: "I enjoyed spending time with members of our Talent & Development program – the young minds helping shape the future of our network …#TeamATT continues to push boundaries of what's possible for generations to come."

16

61.     AT&T's Middletown, New Jersey office was a TDP "hub."

62.     While Plaintiff was in AT&T's Middletown, New Jersey office, she saw the floor on which participants of the TDP worked.  They all appeared to be substantially younger than Plaintiff.

63.     On or about January 16, 2024, AT&T announced the retirement of AVP Meadors (60[1]), and his replacement as the new AVP Tower Ops & Contract Alliances by Emily Chin (39), whose previous position was supporting Jeff McElfesh as Chief of Staff.

64.     Around the same time, Diane Miller, Director-Sourcing Operations (70) was replaced in her duties by Michelle Meyer (49).

65.     In or about February, 2024, Plaintiff attended a work conference at which CEO Stankey expressed that he did not value seniority.

   a.     AT&T uses seniority and years of service as a proxy for age.  Long tenure is a negative.

66.     Ms. Chin physically reported to work at AT&T's Dallas headquarters.

67.     Ms. Chin reported to JR Wilson, VP, who physically reported to work in Atlanta, Georgia.

68.     Mr. Wilson reported to Cheryl Choy, Senior VP, who physically reported to work in Dallas and reported to Chris Sambar, EVP, Network, who also physically reported to work in Dallas and who reported to COO McElfresh, who physically reported to work in Dallas and who reported to CEO Stankey (who also physically reported to work in Dallas).

69.     There were four Level 3 Directors who reported to AVP Chin:  Plaintiff (58, Director, Sourcing Operations, Bedminster, New Jersey); Scott Golding (50, Director Network

---

[1] Ages stated herein are approximations as of the effective date of Plaintiff's termination on July 9, 2024.

Planning, Sacramento, California); Greg Ohmer (68, Director Network Planning, Atlanta, Georgia); and Michelle Meyer (49, Director Sourcing Ops, Dallas, Texas).

70.     AVP Chin had met Plaintiff in person, discussed with Plaintiff an issue regarding Plaintiff's eligibility for AT&T legacy pension, and was aware of Plaintiff's relative age (nearly 20 years older than AVP Chin was).

71.     AVP Chin made comments that reflected age bias and she exhibited age-based hostility toward Plaintiff.  For example, and without limitation: AVP Chin frequently asked Plaintiff "Do you remember…" and made Plaintiff feel self-conscious about her age;  AVP Chin often excluded Plaintiff from conversations with younger coworkers; and AVP Chin interacted with younger employees in a more congenial manner.

72.     AVP Chin engaged in conduct that demonstrated age-bias and a preference for younger employees.  For example, and without limitation, rather than follow usual procedures, Ms. Chin in February/early March, 2024, had Plaintiff take steps to fill a vacancy with Ms. Chin's hand-selected, young candidate, Ryan Taylor (31) effective May 1, 2024, who was a recent graduate of AT&T's FLDP.

73.     On April 11, 2024, AT&T published in its News section of its website an AT&T Blog entry entitled "Empowering the Next Tech Titans:  A Glimpse into AT&T's Technology Development Program."   In the entry, the Assistant Vice President in Technology & Talent Enablement stated that she "had the privilege of witnessing the journey of numerous young talents through AT&T's Technology Development Program (TDP)."

### 2.     AT&T transferred Plaintiff to a disadvantageous location because of her age.

74.     On April 12, 2024, AT&T emailed Plaintiff an "Employee Designation & Location Letter."

75.    The letter began:

> With the recent <u>How & Where We Work</u> announcement, AT&T made the decision to consolidate our national operations into 9 core locations and assign employees to specific offices based on their role.
>
> We are also reducing our workplace designations to two, Office and Virtual.  Workplace designations will be determined based on your work and outcomes your team is driving.
>
> Based on the type of work you perform, your role is being moved to a new location.  Below are details specific to your role.

76.    Plaintiff had received the same letter from AT&T on July 28, 2023, except that it had assigned  Plaintiff to the core location of Bedminster, New Jersey.   Plaintiff was designated as an "Office" worker and was to physically work in the Bedminster office by September 5, 2023.

    a.  By September 5, 2023, Plaintiff physically worked out of AT&T's Bedminster, New Jersy office.

    b.  Plaintiff successfully performed her duties as Director, Sourcing Operations from the office in Bedminster.

    c.  On January 13, 2024, Plaintiff received an "Exceeds" performance evaluation.

77.    Although the stated rationale of the April 12, 2024 letter was the same, and Plaintiff's role was the same, and her workplace designation ("Office") was the same, and Bedminster was still one of the 9 "core" locations, AT&T transferred Plaintiff to a work location in Atlanta Georgia, and she was expected to report to work on November 1, 2024.

78.    The April 12, 2024 letter told Plaintiff, among other things, that she must "accept or decline this offer" by May 13, 2024 and that if she declined the "offer" or failed to respond, she would receive an official surplus notification letter and terminated 14 days thereafter.

    a.  The letter stated:  "Unless you receive this official surplus notification in the future, you are not declared surplus."  The gap between being notified that you were going to be declared "surplus" and receiving the "official" notification and declaration of

surplus was intended to "fiddle" with the definition of decisional unit to mask evidence of age discrimination in the required OWBPA disclosures, as the court cautioned against in *Ray v. AT&T.*

79.     The forced transfer to Atlanta did not include reimbursement of relocation expenses.

80.     The letter suggested the possibility that Plaintiff might have to uproot her residence in New Jersey and establish a new home in or near Atlanta, only to find that she may be assigned to a *different* Geo Zone before she ever even got there.  It identified Plaintiff's Current GEO Zone as N3 and a New GEO Zone of N2, with an expected report date of 11/1/2024.  It stated, though: " *This would be your new Geo Zone if you were to move today.  As the Company periodically re-evaluates Geo Zones, your applicable Geo Zone may be different at the time of your move."

81.     Plaintiff lived in Edison, New Jersey.  Her commute time from her home to the office in Bedminster was about 30 minutes.  She consistently had available a desk at the Bedminster office, and she was able to comfortably perform her job duties.

82.     The forced transfer from her current location to Atlanta was disadvantageous to Plaintiff.

83.     Among other things, and without limitation, Plaintiff would not be able to commute to work in 30 minutes and would not be able to commute to work at all on daily basis.  Plaintiff would have to move her residence in order to physically report to work as required.  She had no home in Atlanta and was offered no relocation support by AT&T.  AT&T suggested the possibility that Plaintiff would uproot her home, and then be forced to move again.  Further, even if Plaintiff were able to move to Atlanta, the reported shortage of available desks and difficulty finding nearby parking would have significantly lengthened the time required to even to get to work.  Moreover,

20

the office space was reportedly cramped and uncomfortable (for example, the presence of exceedingly long elevator waits).

84.    The forced transfer from Bedminster to Atlanta, rather than to Dallas, was disadvantageous to Plaintiff.  Without limitation, the Level 5 leaders in her chain of command physically reported to Dallas, Texas, the work location of AT&T"s "C-Suite."  The nerve center and future of AT&T appeared to be in Dallas, not Atlanta.

85.    The stated reason for the forced transfer to a different location was false and pretextual.  Without limitation:

    a.  As of April 12, 2024:  Bedminster, New Jersey was still one of the 9 "core" locations; Plaintiff's role had not changed; and Plaintiff had successfully performed that role, achieving an Exceeds performance evaluation, from Bedminster.  Nothing about the role had changed since the time of Plaintiff's assignment to Bedminster effective September 5, 2024.

    b.  Most of Plaintiff's job responsibilities involved overseeing performance of resources located off-shore, not in Atlanta.  The operations outside of Atlanta did not require Plaintiff's physical presence in Atlanta.

    c.  No aspect of Plaintiff's role required her physical presence in Atlanta.

    d.  Level 1 managers working in Atlanta were supervised by Level 2 managers, not Plaintiff.

    e.  AVP Chin supervised her direct reports and those on her team from Dallas, not Atlanta.

    f.  The *How and Where We Work* initiative was to have been a company-wide initiative, yet it was not applied consistently nor on a company-wide basis.

    g.  In addition to AVP Chin, there were four other AVPs who reported to JR Wilson: Cameron Dunn; John Wjewoda; Monty Murdock; and Suja John.  Only Plaintiff's team was required to relocate.  Their ages were 52, 59, and 62.

    h.  JR Wilson had 17 employees reporting up to him who physically worked in New Jersey, yet they were not all required to physically relocate.

    i.  Leaders of AT&T, including EVP Chris Sambor, told employees in 2023 that, eventually, all Leaders from Level 3 and up would be working in Dallas.

21

j.   There were many employees within the Choy organization whose physical work locations were scattered across the country, yet they were not required to physically relocate.

86.    AT&T treated Plaintiff less favorably than similarly situated, substantially younger employees.  For example, and without limitation:

a.   Level 3 Director Mr. Golding was permitted to work in a non-core location since July 28, 2023 (when AT&T sent the first Employee Designation and Location Letter to Plaintiff, assigning her to the core work location of Bedminster by September 5, 2023).

b.   Mr. Golding had managers reporting to him who worked in Atlanta and he was not in April, 2024, transferred to physically work in Atlanta with a required reporting date by November 1, 2024.

c.   When Mr. Golding was eventually required to physically relocate, it was a transfer to Dallas, a more favorable location than Atlanta, and, it is believed, with relocation assistance provided.

d.   Michelle Myers (48) had managers reporting to her who worked in Atlanta and she was not in April, 2024, physically transferred to Atlanta with a required reporting date by November 1, 2024.

e.   There were substantially younger managers (including Level 3 Directors) who reported to Mr. Wilson whose teams were not located in the same office as they were who were not forced to transfer to a different location.

f.   There were younger managers (including Level 3 Directors) who reported to Ms. Choy whose teams were not located in the same office as they were who were not forced to transfer to a different location.

g.   There were younger employees who were identified for relocation, but permitted to work outside the core location.  Within the AVP Chin organization, for example, Kathleen Royal (age 39) was identified for relocation from Colorado to Atlanta during the second Quarter of 2024, but continued to work outside of Atlanta past that date.

h.   There were substantially younger employees who were permitted to work as "hybrid" employees and not required to physically work at a core location.  For example, and without limitation, Allean Smith (41) was permitted to physically work in Chicago, which was not the same location as her manager.

22

i. Although Plaintiff could perform the job duties in her role outside of Atlanta, she was not made an "individual contributor" not subject to the physical return to the office at a core location as were substantially younger employees such as Ms. Royal.

j. There were younger employees in New Jersey performing work that was similar to Plaintiff's and they were not physically transferred to a different location.

k. There were more than 200 employees within the Choy organization who were permitted to physically work in non-"core" locations. Upon information and belief, many were substantially younger than Plaintiff.

l. AT&T intentionally failed to provide the job titles and ages of those terminated in connection with this group layoff in order to conceal its age discriminatory impact on older employees.

87.    AT&T transferred Plaintiff to a different location because of her age.

88.    AT&T discriminated against Plaintiff because of her age to her disadvantage in relation to the terms, conditions, and/or privileges of her employment, such as by failing to offer relocation reimbursement.

**3.    The Age-Based Hostile Work Environment Continued And Culminated In Plaintiff's Termination Of Employment Because of Her Age.**

89.    Plaintiff continued to be subject to age-based hostile remarks.

90.    AT&T continued to openly express a preference for younger employees.

91.    AT&T continued to openly support the development and advancement of young employees.

92.    AT&T Leaders continued to make age-biased statements and openly express a preference for younger leaders.

93.    During a staff meeting on May 1, 2024 in which Plaintiff participated, AVP Chin commented that an employee having audio issues sounded like a "Granny."

94.     Rather than consider Plaintiff for vacancies, AT&T brought substantially younger new employees into the JR Wilson organization.  Without limitation:

a.      On April 15, 2026, AT&T announced that Ms. Smith (41) was being brought into the JR Wilson organization.  She was permitted to remain in her Chicago work location and was not required to physically report to a "core" location or the same office location as her manager.

b.      AT&T on May 1, 2024, announced that FLDP graduate Ryan Taylor (31) was being brought into the AVP Chin organization.  Although ostensibly reporting to Plaintiff, he was not required to work in Atlanta.

c.      AT&T on May 9, 2024, announced the hiring effective May 1, 2024, of Brett Morrow (24), from the TDP program.  Mr. Morrow was to report up to AVP Chin.  He was not required to work in Atlanta.

95.     Plaintiff was forced on May 13, 2024, to respond to AT&T's "offer" of a forced transfer to Atlanta, which she "declined."

96.     CEO continued to champion the development of "young" talent.

97.     On or about the week before June 24, 2024, CEO Stankey was physically present at AT&T's offices in New Jersey.  While there, he met with members of Technology Development Program.  On June 24, 2024, AT&T posted on its Life at AT&T Facebook page a photograph of Stankey meeting with what appeared to be several young people and stated: "The day was a great opportunity to build connections and celebrate the work being done by the young professionals who will lead future innovations at AT&T."

98.     On June 24, Plaintiff wrote to AVP Chin that she believed she was asked to move and to be terminated because of her age.

99.     To Plaintiff's knowledge, AT&T did nothing to investigate Plaintiff's complaint of age discrimination.

100.    On June 25, 2024, AT&T sent Plaintiff a Surplus Notification Letter notifying her of her selection for surplus status and terminating her employment effective July 9, 2024.

101.    The Surplus Notification Letter stated that Plaintiff was placed on surplus status because her position was eliminated.

102.    This is false and pretextual.  Plaintiff's position was not eliminated.  On the contrary, Plaintiff was replaced in the performance of her duties by a substantially younger employee, Caleb Hill (50).

103.    AT&T terminated Plaintiff because of her age.

104.    AT&T presented to Plaintiff in exchange for severance what purported to be a "General Release" of all claims, including under the ADEA, but which failed to comply with the requirements of the OWBPA.   The ADEA Listing defined the Decisional Unit as those in AVP Chin's organization *who declined the "offer" to relocate* and then provided the job title and ages of those "selected" for surplus from among only that pool (*i.e.*, everyone).  It provided no information as to the job titles and age of those who were retained in the group layoff in clear violation of the ADEA, as amended by the OWBPA, and the Court's Order and Opinion in *Ray v. AT&T*.

105.    AT&T made misrepresentations to the EEOC in response to Plaintiff's Charge. Among other things, AT&T falsely denied that CEO made the brazen ageist statements during the July, 2023 Town Hall as characterized by Plaintiff.

106.    AT&T's Position Statement to the EEOC states that Plaintiff was surplussed because she declined relocation.  This is not a legitimate, non-discriminatory reason.  The forced relocation was because of age, and Plaintiff's "declining" it was, in fact, opposing AT&T's age discrimination.

C.      **Defendants' Unlawful Conduct Has Harmed Plaintiff.**

25

107.    AT&T has treated Plaintiff less favorably than similarly situated employees who are substantially younger than Plaintiff.

108.    Since no later than May, 2023, AT&T subjected Plaintiff to a continuing hostile work environment because of her age.

109.    Unlike her substantially younger colleagues, Plaintiff was subjected to a constant drumbeat at AT&T that, notwithstanding her outstanding performance, AT&T wanted her to leave the company because of her age.

110.    Plaintiff was subjected to AT&T's freely and openly expressed culture of age bias.

111.    The age-biased stereotypes and animus directed at AT&T's older employees came from the very top of the company.

112.    The age-biased stereotypes and animus were never addressed by Human Resources or otherwise.  No prompt or corrective action was ever taken because age discrimination was the company policy and or standard operating procedure.

113.    The age-based hostile work environment to which Plaintiff was subjected was a continuing violation beginning no later than May, 2023, and culminating in Plaintiff's termination effective July 9, 2024.

114.    As CEO Stankey had expressed that AT&T needed younger employees in July, 2023, so CEO Stankey and AT&T championed "young professionals" in June, 2024.

115.    As CEO Stankey had expressed hostility against older employees in July, 2023, so AVP Chin expressed hostility against older employees in May, 2024.

116.    As CEO Stankey had expressed his support for AT&T "young minds" in September, 2023, so AVP  Chin brought into her organization effective in May, 2024, at least two significantly younger employees who had completed AT&T's Talent Development Programs.

Case 3:26-cv-03561-GC-RLS    Document 1    Filed 04/02/26    Page 27 of 31 PageID: 27

117. As complaints about CEO Stankey's brazen ageist statements in July, 2023, were not addressed by AT&T, so Plaintiff's complaint of age discrimination to AVP Chin in June, 2024 was not addressed.

118. AT&T transferred Plaintiff to a disadvantageous location because of her age.

119. AT&T did not permit Plaintiff to work remotely because of her age.

120. AT&T did not offer Plaintiff reimbursement for relocation expenses because of her age.

121. AT&T did not offer Plaintiff an alternative to surplus/termination because of her age.

122. AT&T did not extend the period of Plaintiff's employment before she was required to relocate because of her age.

123. AT&T placed Plaintiff on surplus status and terminated Plaintiff's employment because of her age.

124. AT&T presented to Plaintiff what falsely purported to be a General Release of all claims, including for age discrimination in violation of federal law, because of her age.

125. The age-biased stereotypes and animus directed at AT&T's older employees from the highest level of the company and the age-based hostile comments and conduct directed at Plaintiff in particular by management in her chain of command were offensive and extremely upsetting to Plaintiff such that it detrimentally affected her.

126. The age-biased stereotypes and animus directed at AT&T's older employees from the highest level of the company and the age-based hostile comments and conduct directed at Plaintiff in particular by management in her chain of command would have detrimentally affected a reasonable person in similar circumstances.

127. The hostile conduct and comments to which Plaintiff was subjected because of her age was severe and/or pervasive enough to alter the terms or conditions of her employment.

128. AT&T knew or should have known of the hostile work environment to which Plaintiff was subjected and failed to take prompt and effective remedial action.

129. The hostile work environment to which Plaintiff was subjected because of her age culminated in the termination of her employment.

130. Defendant John Stankey actively and purposefully aided and abetted AT&T's age discrimination against Plaintiff.

131. As a direct and proximate result of Defendants' age discriminatory conduct, Plaintiff has in the past incurred, and may in the future incur, a loss of earnings and earning capacity, loss of benefits, pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures, the full extent of which is not known at this time.

132. The conduct of Defendants, as set forth above, was willful, malicious, intentional, and/or with reckless disregard for Plaintiff's rights under federal and state law, and warrants an award of punitive damages and/or liquidated damages.

133. Plaintiff is now suffering and will continue to suffer irreparable injury unless this Court grants appropriate relief.

## **COUNT I – ADEA (against AT&T)**

134. Plaintiff incorporates by reference the foregoing paragraphs as if set forth herein in their entirety.

135. By committing the foregoing acts of age discrimination, AT&T has violated the ADEA.

136.    As a direct and proximate result of AT&T's  violations of the ADEA, Plaintiff has suffered the injuries, damages and losses set forth herein, including lost wages and benefits, emotional distress, humiliation, and loss of career opportunities, and has incurred attorneys' fees and costs.

137.    AT&T acted willfully and in knowing disregard toward the federally protected rights of Plaintiff, warranting the imposition of liquidated damages under the ADEA.

138.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of AT&T's age discriminatory acts unless and until this Court grants the relief requested herein.

139.    No previous application has been made for the relief requested herein.

### COUNT II – NJLAD (against all Defendants)

140.    Plaintiff incorporates by reference the foregoing paragraphs as if set forth herein in their entirety.

141.    By committing the foregoing acts of age discrimination, AT&T has violated the NJLAD.

142.    CEO Stankey aided and abetted AT&T in discriminating against Plaintiff because of her age.

143.    As a direct and proximate result of Defendants' violations of the NJLAD, Plaintiff has suffered the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

144.    Members of AT&T's upper management were directly involved in and/or willfully indifferent to the discrimination set forth herein, and Defendants' conduct was especially egregious, thus warranting the imposition of punitive damages against Defendants.

29

145.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of AT&Ts' discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

146.    No previous application has been made for the relief requested herein.

## RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants:

a.    declaring the acts and practices complained of herein to be in violation of the ADEA;

b.    declaring the acts and practices complained of herein to be in violation of the NJLAD;

c.    enjoining and permanently restraining the violations alleged herein;

d.    entering judgment against Defendants and in favor of Plaintiff in an amount to be determined;

e.    awarding damages to make Plaintiff whole for all lost earnings, earning capacity, and benefits, past and future, which Plaintiff has suffered or may suffer as a result of Defendants' unlawful conduct;

f.    awarding compensatory damages to Plaintiff for past and future pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasures;

g.    awarding liquidated damages to Plaintiff under the ADEA;

h.    awarding punitive damages to Plaintiff under the NJLAD;

i.    awarding Plaintiff such other damages as are appropriate under the ADEA and NJLAD;

j.      awarding Plaintiff the costs of suit, expert fees and other disbursements, and reasonable attorneys' fees; and

k.      granting such other and further relief as this Court may deem just, proper, or equitable.

Respectfully submitted,

**CONSOLE MATTIACCI LAW LLC**

Dated: April 2, 2026                    BY: _____

Susan M. Saint-Antoine, Esquire
Kevin Console, Esquire
110 Marter Ave., Suite 502
Moorestown, NJ 08057
T: 215-545-7676
santanto@consolelaw.com
kevinconsole@consolelaw.com

*Attorneys for Plaintiff,*
*Lorraine Lopez*

31