**IN UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **LORRAINE LOPEZ** | : | **CIVIL ACTION NO. 26-cv-03561** |
| | : | |
| **Plaintiff,** | : | |
| | : | **JURY TRIAL DEMANDED** |
| | : | |
| **v.** | : | |
| | : | |
| **AT&T, INC.,** *et al.* | : | |
| | : | **MOTION DATE: August 17, 2026** |
| **Defendants** | : | |
| | : | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT JOHN STANKEY'S**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

**CONSOLE MATTIACCI LAW, LLC**

By: _____

Susan Saint-Antoine, Esquire
Kevin Console, Esquire
Holly Smith, Esquire
110 Marter Avenue, Suite 502
Moorestown, NJ 08057
(856) 854-4000 (phone)
(215) 405-2900 (fax)

Motion Date: August 17, 2026

*Attorneys for Plaintiff,*
*Lorraine Lopez*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................iii

I.  INTRODUCTION ..................................................................................1

II.  PROCEDURAL BACKGROUND ........................................................4

III. STANDARD OF REVIEW ...................................................................7

    A. Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction......7

    B. Rule 12(b)(6) Motion to Dismiss for Failure To State A Claim..........8

IV.  BRIEF SUMMARY OF FACTS AND DEFENDANT STANKEY'S
    PERTINENT CONTACTS WITH NEW JERSEY ..........................................8

    A. Plaintiff Worked For AT&T In New Jersey And Reported Up To
       Defendant Stankey................................................................8

    B. AT&T Presence In New Jersey, Including Its Technology
       Development Program For Young Employees Championed By
       Defendant Stankey................................................................9

    C. Defendant John Stankey......................................................10

    D. Defendant Stankey's Contacts in New Jersey Relating to
       Plaintiff's Claims Against Him...............................................10

        1. CEO Stankey's support of young talent through the TDP in
          New Jersey ...............................................................11

        2. Defendant Stankey's physical presence in New Jersey and
          the preference for younger employees and hostility toward
          older ones that he overtly expressed to AT&T employees
          working in New Jersey ...............................................11

        3. CEO Stankey's intent and promotion of the HWWW to reduce
          the number of older employees, pursuant to which Plaintiff was
          forced to relocate from New Jersey and her employment

was terminated ...................................................................................13

    4.  CEO Stankey directly contributed to the hostile work
environment to which Plaintiff was subjected in New Jersey ............17

V.  ARGUMENT ..........................................................................................14

    A.  The Court Has Specific Personal Jurisdiction Over Defendant
Stankey And May Adjudicate Claims Against Him For His
Violation Of The NJLAD ....................................................................18

        1.  Defendant Stankey's contacts with the forum are not excluded
from consideration by the application of a "corporate shield." ..........19

        2.  There is specific jurisdiction under the "traditional" test....................21

        3.  Alternatively, Specific Jurisdiction Exists Under The Calder Effects
Test ....................................................................................................25

        4.  Stankey has made no showing that the exercise of personal
jurisdiction would offend traditional notions of fair play and
substantial justice ...............................................................................26

        5.  In The Alternative, The Court Should Permit Plaintiff To Conduct
Jurisdiction Discovery Simultaneously With Merits Discovery........27

    B.  Plaintiff's Has Stated A Claim Against Defendant Stankey For
Aiding And Abetting AT&T's Violation Of The NJLAD ...............................28

VI.  CONCLUSION.........................................................................................31

ii

I.    **INTRODUCTION**

New Jersey's Law Against Discrimination is a broad, remedial statute intended to eradicate the cancer of discrimination in the workplace.  It prohibits discrimination based on age and specifically provides for individual liability.

New Jersey's long-arm statute authorizes the exercise of personal jurisdiction coextensive with the U.S. Consitituion.  It reaches to the outermost limits that Due Process will permit.

Neither requires the very narrow and limited type of activity that Defendant, John Stankey, argues for in his brief.  The personal jurisdiction analysis considers a defendant's contacts with the forum state, not with the particular individual plaintiff.  It requires that a plaintiff's claims relate to those contacts, not be immediately and directly caused by them.  The NJLAD makes it unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this Act."  N.J.S.A. § N.J.S.A. § 10:5-12(e).   It does not require that the defendant himself committed the forbidden act, does not require that the defendant aim his conduct at particular person, and does not exempt from liability a company officer.  Defendant Stankey's Motion is wrong on the law when he argues otherwise.

1

Defendant Stankey's Motion is wrong on the facts, too.  It mischaracterizes Plaintiff's Complaint as alleging that he had "a secret intent to discriminate[1]" untethered to her claims.  Quite the opposite.  This is the extraordinary discrimination case in which the CEO came right out and directed the discrimination against the company's older employees.  Plaintiff's Complaint alleges, without limitation:

- CEO Stankey openly championed the development of young talent through AT&T's Technology Development Program ("TDP") in New Jersey, a graduate of which Plaintiff points to as an example of preferential treatment in connection with her forced relocation.

- CEO Stankey openly expressed his belief that "young professionals" were more likely to move.

- CEO Stankey expected and intended the *How and Where We Work* initiative ("HWWW"), which coupled a return to office requirement with a consolidation of office locations (*i.e.*, forcing employees to physically move), to reduce the number of AT&T's older employees. He said as much when he announced the HWWW in thinly veiled ageist terms.

- CEO Stankey directed his subordinates to use the HWWW as a vehicle to reduce the number of AT&T's older employees.  He told them so when he explained the HWWW and the resulting loss of employees with experience and expertise by stating that the company "needed younger employees" to carry the company into future and that the HWWW initiative was an "opportunity to say goodbye" to the older workers.

- AT&T moved Plaintiff's job out of New Jersey and forced her to relocate to another state pursuant to the HWWW.  As expected and

---

[1] Defendant Stankey's Memorandum, ECF 19-2, at p. 23.

intended, Plaintiff declined the "offer" of a forced relocation and was terminated pursuant to the HWWW.

- CEO Stankey repeatedly and overtly expressed his preference for younger employees.

- Defendant Stankey directly contributed to the age-based hostile work environment to which Plaintiff was subjected in New Jersey. Among other things, he went to New Jersey, lamented to an audience that included Plaintiff that he was an "old guy" (in fact, he was about Plaintiff's age) who was not going to work much longer in contrast to the wonderful looking young employees.

While Defendant Stankey's *motion* might be nearly identical to the one he filed in *Minguez v. AT&T*, the *circumstances* are not.[2] The issue before the Court of whether to dismiss Defendant Stankey in this case is materially different from what the Honorable Robert Kirsch, D.N.J., considered in *Minguez* and it deserves its own careful[3] consideration. Unlike in *Minguez*,[4] without limitation:

- Plaintiff Lorraine Lopez does not rely on the mere allegations of her complaint, but instead supports the exercise of personal jurisdiction with competent evidence of defendant Stankey's contacts with the forum.

---

[2] See ECF 19-2 at pp.1, 23. .

[3] Defendant's supporting Memorandum appears to borrow significantly from the one he filed in *Minguez*. It argues for the dismissal of "Plaintiff's First Amended Complaint," which was the operative complaint in *Minguez* but does not exist here. Defendant's Motion also states that Plaintiff Lopez sued AT&T for retaliation (and defendant Stankey as an aider and abettor). Gary Minguez' s First Amended Complaint brought a retaliation claim, but Plaintiff Lopez's does not.

[4] *Compare* the June 16, 2025 opinion issued by Judge Kirsch in Minguez v. AT&T Corp., et al, C.A. No. 24-09069 (attached as Exhibit A to Defendant Stankey's Brief here (ECF 42-2).

- Plaintiff Lopez actually heard while working in New Jersey defendant Stankey state that the company needed younger workers and explain that the HWWW was a vehicle to "say goodbye" to its older ones.

- Plaintiff Lopez was still employed and actually heard Stankey in New Jersey express a preference for younger employees and express great hostility towards older ones.

- Plaintiff has asserted an age-based hostile work environment to which she was subject in New Jersey and to which defendant Stankey directly and significantly contributed.

Defendant Stankey's Motion, if granted, would gut the NJLAD's individual liability provision and turn employment discrimination jurisdictional analysis on its head. An employee who worked and was discriminated against in the state of New Jersey should not have to go to Texas to enforce New Jersey's Law Against Discrimination. Defendant Stankey's Motion should be denied.

## II.    PROCEDURAL BACKGROUND

Plaintiff, Lorraine Lopez, brought a timely EEOC Charge against AT&T for age discrimination in violation of the ADEA. (There is no administrative exhaustion requirement under the NJLAD.) In their Position Statement (attached hereto as Ex. B-1), AT&T admitted that CEO Stankey "supported AT&T's efforts to attract and foster the development of younger employees…"

On April 2, 2026, Plaintiff filed a timely Complaint against defendants, AT&T, Inc., AT&T Mobility Services LLC, and John Stankey. ECF 1. Plaintiff's Complaint alleges that the AT&T defendants discriminated against her because of

4

her age in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621, *et seq.* (ADEA) and the New Jersey Law Against Discrimination, as amended, N.J.S.A. § 10:5-1, *et seq.* ("NJLAD") in connection with several adverse actions, including subjecting her to a continuing age-based hostile work environment, forcing her to relocate out of New Jersey, and terminating her employment when – as intended – she "declined" to do so. Plaintiff's Complaint alleges that AT&T's CEO, Defendant Stankey, violated the NJLAD as an aider and abettor of AT&T's age discriminatory acts against Plaintiff. Plaintiff's Complaint sets forth in ¶28 and its subparts a specific and detailed factual basis for the exercise of specific personal jurisdiction over defendant Stankey.

By letter dated June 8, 2026 (ECF 10), all defendants (including Defendant Stankey, without reservation) requested pursuant to Local R.Civ.P. 40.1(d) that Chief Judge Bumb reassign Plaintiff's case from the Honorable Georgette Castner to Judge Kisch, before whom the *Minguez* case is pending. On June 12, 2026, Chief Judge Bumb found "that this case is not sufficiently related to that presently before Judge Kirsch, *Minguez v. AT&T Corp.,* No. 24-09069, under Local Civil Rule 40.1(c)" and denied Defendants' request. (ECF 14.)

The AT&T Defendants answered Plaintiff's Complaint on July 6, 2026. (ECF 20.) The Answer admits that Plaintiff worked in New Jersey. (ECF 20 ¶ 45.) It admits that Plaintiff reported up to CEO Stankey (ECF 20 ¶¶69, 67). AT&T <u>does</u>

5

not contest that Plaintiff has stated a claim against AT&T for subjecting her to a continuing age-based hostile work environment beginning no later than May, 2023, and culminating in her termination effective July 9, 2024.  As to brazen age-biased statements made by CEO Stankey that contributed to the age-based hostile work environment, AT&T does not deny them and instead generally answers that they "speak for themselves."

Nonetheless, defendant Stankey on July 6, 2026 filed a motion to dismiss Plaintiff's complaint under Fed.R.Civ.P. 12(b)(2) and 12(b)(6).  (ECF 19.) Defendant Stankey's Memorandum in support of his Motion notably: 1) relies primarily on the *Minguez* decision and asserts (incorrectly) that the cases share "almost identical circumstances;"  2) changes his position and argues (erroneously) that the fiduciary shield doctrine precludes consideration of acts undertaken by defendant John Stankey in his corporate capacity[5]; and 3) other than a passing reference, continues to ignore Plaintiff's claim that she was subjected to a hostile

---

[5] Defendant Stankey got it right the first time in his June 15, 2026, letter requesting a pre-motion conference (ECF 15), in which he argued that the Court's jurisdiction over AT&T "does not automatically establish  jurisdiction over Mr. Stankey," and did not take the position that his contacts in New Jersey undertaken in his corporate capacity should not be considered for purposes of establishing personal jurisdiction.

work environment in New Jersey to which defendant John Stankey directly contributed.[6]

Plaintiff now files her Opposition to Defendant Stankey's Motion, and submits competent evidence supporting the Court's personal specific jurisdiction over him.  Attached hereto as Exhibit A is the sworn Declaration of Lorraine Lopez with accompanying exhibits ("Lopez Decl."). Exhibit B is the sworn Declaration of the undersigned counsel, Susan Saint-Antoine, with accompanying exhibits ("Saint-Antoine Decl.").

## III.    STANDARD OF REVIEW

### A.    Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

When a defendant raises a jurisdictional defense, the plaintiff bears the burden of proving by affidavits or other competent evidence that jurisdiction is proper.  As Judge Kirsch pointedly noted in his *Minguez* opinion, competent evidence may include sworn affidavits, but does not include a mere unverified complaint.  However, when a court does not hold an evidentiary hearing, the plaintiff need only establish a *prima facie* case of personal jurisdiction, and the court is required to accept the plaintiff's allegations as true, and is to construe

---

[6] Plaintiff's letter (ECF 17) in response to Defendant Stankey's request for a pre-motion conference pointed out that he ignored completely Plaintiffs' claim against defendant Stankey for aiding and abetting the hostile work environment to which she was subjected in New Jersey.  His instant Motion continues to do so.

7

disputed facts in favor of the plaintiff." *See, e.g., Carteret Sav. Bank v. Shushan*, 954 F.2d 141 (3d Cir. 1992).

Further, the Court may in its discretion allow jurisdictional discovery before deciding whether it has personal jurisdiction over a defendant. *E.g., Mass Sch. Of L. at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1977). Generally, "jurisdictional discovery should be allowed unless the plaintiff's claim is clearly frivolous." *Id.* at 1042 (internal quotation marks omitted).

### B.      Rule 12(b)(6) Motion to Dismiss For Failure To State A Claim

When evaluating a motion to dismiss for failure to state a claim, courts must accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint contains enough facts to state a claim to relief that is plausible on its face. *E.g., Young v. Wipro Ltd.*, 2026 U.S. Dist. LEXIS 151609, *4 (D.N.J., July 9, 2026)(quoting *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023).

### IV.     BRIEF SUMMARY OF FACTS AND DEFENDANT STANKEY'S PERTINENT CONTACTS WITH NEW JERSEY.

#### A. Plaintiff  Worked For AT&T In New Jersey And Reported Up To Defendant Stankey.

Plaintiff is a resident of New Jersey and has lived in Edison since 2005. Lopez Decl.¶1.  She worked for AT&T in New Jersey for more than twenty-seven (27) years.  *Id.* at ¶4.  Plaintiff was born in March, 1966, and was fifty-eight (58)

years of age as of the effective date of her termination from AT&T on July 9, 2024. *Id.* at ¶3.

At the time of her involuntary termination, Plaintiff held the position of Director, Sourcing Operations, and worked in AT&T's Bedminster, New Jersey office. *Id.* at ¶¶5, 6. Plaintiff reported up to defendant Stankey during the time she worked in New Jersey and was, she alleges, subject to a continuing age-based hostile work environment that culminated in her forced relocation and involuntary termination. *Id.* at ¶7.

In or about January, 2024, AVP Emily Chin (approximately age 39) replaced George Meadors (approximately age 60) as Plaintiff's first level supervisor. Lopez Decl. ¶8. Ms. Chin's prior position was as Chief of Staff to Jeff McElresh, COO, who reported directly to CEO Stankey. (ECF 20, ¶¶63, 68.) Like Plaintiff, Ms. Chen also reported up to COO McElfresh (who reported up to Stankey).

**B.     AT&T's Presence In New Jersey, Including Its Technology Development Program For Young Employees Championed By Defendant Stankey.**

In 2023 and 2024, AT&T in New Jersey employed thousands, maintained scores of office locations, and more than one hundred retail stores. Lopez Decl. at ¶9. AT&T's Bedminster, New Jersey office, to which Plaintiff was assigned, was considered in 2022 to be one of the company's primary corporate locations. *Id.* at

9

¶11.  AT&T's Middletown, New Jersey Campus  was (and remains) the location for AT&T's Technology Development Program ("TDP").  *Id.* at ¶12.

AT&T's facilities, operations and employees in New Jersey have been essential to the company's success and have contributed significantly to AT&T's success.  *Id.* at ¶ 10.

### D.    Defendant John Stankey.

Defendant Stankey started his career with AT&T in 1985, and has held senior leadership positions with the company since 2003.  Ex. B-2.  Defendant Stankey had, as of April, 2023, "more than 35 years of experience spanning nearly every area of AT&T's business, which has provided him with intimate knowledge of [the] Company, values and culture." *Id.*    He has been AT&T's CEO since 2020, and in February, 2025, was elected as Chairman of the Board.  *Id.*  As CEO, Defendant Stankey was "in charge of the affairs of the company." Ex. B-3.

For many years, and during which time Defendant Stankey held a senior leadership position, AT&T engaged in a pattern or practice of age discrimination.  See generally ECF 1 ¶36.  Since becoming CEO in 2020, Defendant Stankey expressed outrageously offensive ageist statements and promoted even more explicitly than his predecessors AT&T's policy of age discrimination.  ECF 1 ¶36.f.iii.

### D.    Defendant Stankey's Contacts In New Jersey Relating to Plaintiff's Claims Against Him.

10

1. **CEO Stankey's support of young talent through the TDP in New Jersey.**

Defendant Stankey came to AT&T's New Jersey offices and met with employees in 2023 and 2024, often to champion the TDP in Middletown. Lopez Decl. ¶14.

AT&T promoted the Technology Development Program in Middletown, New Jersey as a program to develop young talent and has described its participants as the "young professionals who will lead future innovations at AT&T". Ex. B4. While she was in AT&T's Middletown, New Jersey office, Plaintiff saw that TDP participants had their own floor of the building. Lopez ¶16. She observed that all of the participants appeared to be substantially younger than she was. *Id.* CEO Stankey was an active and vocal supporter of the TDP program in Middletown, New Jersey, and, in particular, its young participants. Lopez Decl. ¶15; B-4, B-5.

AT&T has admitted that CEO Stankey "supported AT&T's efforts to attract and foster the development of young employees." Ex. B-1.

2. **Defendant Stankey's physical presence in New Jersey and the preference for younger employees and hostility toward older ones that he overtly expressed to AT&T employees working in New Jersey.**

On or about September 18, CEO Stankey was present in New Jersey and spoke to participants of the TDP at an "Open-Mic" night in AT&T's Middletown, New Jersey office. Lopez Decl. ¶31; B-5. Plaintiff attended this event during

11

work hours  and heard Defendant Stankey address the employees in attendance.

Lopez Decl. ¶31.  Stankey (then 61) stated:

> We could have a not so durable relationship with the
> shareholder, which is better than today.  What would it be?
> Anybody want to guess?  I'm an old guy, a lot of gray hair,
> not going to be in this job 10 years.  You're all young.  You
> look wonderful.  I can see you all out there.  You're going
> to be in your jobs a long time.  You want this business to
> be around.  You want a good place to come and work and
> apply your skills and abilities.  You care about durability.
>
> I'm an old guy.  I'm not going to work much longer….

Ex. B-6.

CEO Stankey posted about his time in the Middletown, New Jersey office and

praised "the young minds helping shape the future of our network…"  Ex. B-5.

CEO Stankey met with AT&T employees in the Bedminster, New Jersey

office on or about November 6, 2023.  Lopez Decl. ¶32  ; see also  Ex. B-7.  Plaintiff

was there.  Lopez Decl. ¶31.   She heard Defendant Stankey express words to the

effect that you needed to be a certain age to keep up with the market and that the

company was underrepresented in the number of employees in their twenties and

thirties.  Lopez Decl. ¶ 32.  CEO Stankey stated that AT&T needed a workforce in

terms of age that mirrored the market of the customers they wanted. *Id.*

Plaintiff was aware that on or about June 14, 2024, CEO Stankey spent a few

days with AT&T employees in New Jersey.  Lopez Decl. ¶36;  Ex. B-8.  Defendant

12

Stankey met with members of the TDP.  B-4.  AT&T posted on its Life at AT&T Facebook page a photograph of CEO Stankey meeting with what appeared to be several young people and stated:  "The day was a great opportunity to build connections and celebrate the work being done by the young professionals who will lead future innovations at AT&T."  Ex. B-4.

### 3. CEO Stankey's intent and promotion of the HWWW to reduce the number of older employees, pursuant to which Plaintiff was forced to relocate from New Jersey and her employment was terminated.

Defendant Stankey has expressed  his belief that "young professionals" were more likely to move for their jobs.  Ex. B-9.  The converse is that older professionals are less likely to move for their jobs.

In or about May, 2024, while working in New Jersey, Plaintiff received an invitation to join in to a webcast in which CEO Stankey was to address management and speak about AT&T's *How and Where We Work* initiative ("HWWW").  Lopez Decl. ¶17.  She also received and read an email from Stankey announcing the HWWW.  *Id.* at ¶18.  AT&T's HWWW coupled a physical return to the office requirement with a consolidation of work locations across the country.  B-10.

Around the same time, Plaintiff read several articles discussing an interview that CEO Stankey gave to Bloomberg radio.  Lopez Decl. ¶19; B-10.  Stankey expressed in thinly veiled age-biased language his expectation that the HWWW

initiative, by coupling a consolidation of work locations and a physical return to the office retirement, would result in the elimination of about 9,000 managers and that most of them would be older.  *See, e.g.*, B-10.

In or around May 30, 2023, AT&T announced that it was closing its Bedminster office on One AT&T Way (Route 78) and relocating to a much smaller office in Bedminster on Route 206.  Lopez Decl. ¶20; Ex. B-11.  The Route 206 office was about one quarter of the size of the prior one.  Ex. B-11. [7]

In July, 2023, Plaintiff received an invitation to participate in a live and interactive Q2 Employees Earnings webcast ("Town Hall") to which all AT&T managers, including those working in New Jersey, were encouraged to attend during work hours.  Lopez Decl. ¶21.

Plaintiff participated in the webcast during work hours from her workplace in New Jersey.  Lopez Decl. ¶22. The speakers included CEO Stankey and COO Jeff McElfresh, among others.  *Id.*  CEO Stankey responded to a question about the HWWW initiative and losing people with experience.  Lopez Decl. 23. Mr. Stankey explained as follows:

---

[7] Excerpts of AT&T documents filed in another age discrimination case against AT&T suggest that AT&T considered the Bedminster office (Route 78) as an opportunity for closure because of the high percentage of employees who worked there who met the Modified Rule of 75 (age and service).  See Saint-Antoine Decl. ¶14.

I think – I'd just offer that it's expertise and experience – coming from the oldest guy in the room – is, you know, shouldn't be underrated.  But there are people who have a different perspective than me that maybe grew up in a different time and place and were exposed to different things that oftentimes can bring a better idea to the table or a new way of looking at something.  And we want to value the expertise and we want to make sure that we— we're going to make some mistakes here and there, where we always catch ourselves short.  We also ought to understand the upside of getting diverse points of view into our company that may be different from different experiential levels, and especially when we're making a transition to entirely new product sets and starting to deemphasize that which helped us for 20, 30, 40 years.

And we have a mathematical issue that **we have to deal with in our company.  The profile of our workforce does not match the profile of the population of the United States and the customer base, both in terms of matching it demographically and matching it from an age perspective.  We need younger people working at this company** because that is the largest market now starting to mature into decision making levels and we need people around to help educate us about how they think and what they do and they need to be germane to what we do every day in running our companies**.  So this is an opportunity for us to think about, <u>yeah, it's hard to say goodbye to that, which we know and really well-trained people who've had a lot of experience.</u>  It can be emotional.  <u>But it's also a great opportunity</u> for us to develop different points of view and <u>build the next generation that's going to ultimately carry this durable business forward in the future</u>.** (Emphasis added.)

See Saint-Antoine Decl. ¶13, Ex. B-12.

Plaintiff observed that no one from AT&T sharing the stage with CEO

Stankey on July 26, 2023  – including COO Jeff McElfresh (whose Chief of Staff

at the time was Ms. Chin) --  expressed any disagreement with or outrage at CEO Stankey's direction to discriminate against older employees.  Lopez Decl. ¶25.

CEO Stankey's statements were extremely upsetting to Plaintiff and many of her older colleagues who worked in New Jersey.   Following the webcast, and while at work in New Jersey, Plaintiff saw that CEO Stankey posted a written follow-up message to the Town Hall, read by Plaintiff at her workplace in New Jersey. Lopez Declaration ¶16.   His message did not in any way take back, explain or apologize for his earlier remarks for his remarks.  *Id.*  Plaintiff never received from AT&T any communication disavowing or addressing what Stankey said. Lopez Decl. ¶27.

In or about July 28, 2023, Plaintiff received a letter designating her as an "Office" worker who was required to physically work out of the new, smaller Bedminster office (Route 206 location).  Lopez Decl.  ¶ .

Following additional communications from CEO Stankey expressing a preference for younger employees, Plaintiff on or about April 12, 2024, was notified of her forced transfer out of New Jersey to Atlanta pursuant to the HWWW, where she was  expected to report to work on November 1, 2024.  Lopez Decl. ¶33; Ex. A-2. The notification raised the prospect that she might have to uproot her residence again even before she got to Atlanta.  Ex. A-2.  When she

"declined" the "offer" to relocate out of New Jersey, she was "surplussed" and notified of her termination effective July 9, 2024.  Lopez Decl. ¶35, A-3.

Rather than consider Plaintiff for any vacancies, AT&T brought in young employees into Ms. Chin's organization, including a 24 year old recent graduate of the TDP.  ECF 1 ¶94(c); Lopez Decl. ¶35, Ex. A-3.

### 4. CEO Stankey directly contributed to the hostile work environment to which Plaintiff was subjected in New Jersey.

Plaintiff experienced firsthand CEO Stankey's preference for younger employees and hostility against older ones.  Without limitation:

- Plaintiff was aware that CEO Stankey championed the development of young workers through the TDP in Middletown.

- Plaintiff heard CEO Stankey's brazen statements against older employees during the July 26, 2023, Town Hall to which managers were invited to participate. He heard him express that the company needed younger workers and the HWWW was an opportunity to say goodbye to the older ones.  She saw that no one challenged them.

- She received on or about July 28, 2023, his message praising the former Head of Human Resources for her passion for mentoring young people.

- Plaintiff was present on September 18, 2023, and heard his hostile statements to employees in Middletown.

- She was present in Bedminster on or about November 13, 2023, when he said that the company needed to mirror their customer base and was underrepresented in terms of employees in their twenties and thirties.

17

CEO Stankey's remarks were extremely offensive and upsetting to Plaintiff. Lopez Decl. ¶¶24, 31, 32.  CEO Stankey contributed to the age-based hostile work environment to which Plaintiff was subjected in New Jersey.  Id. ¶38.

## V.    ARGUMENT

### A.    This Court Has Specific Personal Jurisdiction Over Defendant Stankey And May Adjudicate Claims Against Him For His Violation Of The NJLAD.

A federal district court sitting in New Jersey may exercise personal jurisdiction over a nonresident to the extent authorized by the law of the state of New Jersey.  *E.g., Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 96 (3d Cir. 2004)(citations omitted).  New Jersey's long-arm statute authorizes jurisdiction over nonresidents coextensive with the due process requirements of the United States Constitution.  N.J. Ct. R. 4:4-4 (c).  The Court has personal jurisdiction over a party that has "constitutionally sufficient 'minimum contacts' with New Jersey. *E.g., Carteret Sav. Bank v. Shushan*, 954 F.2d 141, 149 (3d Cir. 1992).

In deciding whether it may exercise specific jurisdiction, a court must first determine whether the defendant has the minimum contacts with the forum necessary to have reasonably anticipated being haled into court there.  Second, once minimum contacts have been established, a court may inquire whether the assertion of personal jurisdiction would comport with traditional notions of fair

18

play and substantial justice.  *See, e.g.,* Law v. Virtus Partners Holdings, LLC, 2023 U.S. Dist. LEXIS 32414 (D.N.J. Feb. 27, 2023).

Plaintiff has demonstrated "minimum contacts" in at least three areas: Plaintiff's forced relocation; her surplus and termination; and the hostile work environment to which she was subjected.  The Court has specific personal jurisdiction under either or both the "traditional" test of the "effects" test.

1.    **Defendant Stankey's contacts with the forum are not excluded from consideration by the application of a "corporate shield."**

Defendant Stankey argues that the fiduciary shield excludes from consideration those contacts with New Jersey that CEO Stankey engaged in in his corporate capacity.  Not so.  This argument is contrary to what the Supreme Court has said, misconstrues the primary case upon which it relies, and has been consistently rejected by the District Courts in New Jersey in cases involving conduct for which individual liability might attach, including under the NJLAD.

In *Calder v. Jones*, 465 U.S. 783, 789 (1984) and *Keeton v. Hustler Magazine, Inc,* 465 U.S. 770 781, n. 13 (1984), the Supreme Court explained that jurisdiction over an employee does not <u>automatically</u> follow from jurisdiction over the corporation which employs him; rather, each defendant's contacts with the forum must be assessed individually.  *Keeton* and *Calder* reject "the suggestion that employees who act in their official capacity are somehow shielded from suit in

19

the individual capacity." *Keeton*, 465 U.S. at 781, n. 13 (citing *Calder,* 465 U.S. at 789 (1984).

What the Third Circuit said in *Moneygram* was consistent with the Supreme Court.  A corporation's contacts with the forum state will not be automatically imputed to an employee or officer.  But an defendant's status as a corporate officer will not insulate him from liability under a statute that provides for it.

The District Courts in New Jersey recognize and have explained that "[i]t would be anomalous, and would defeat the purposes of the law creating substantive liability, to permit a corporate officer to shield himself from jurisdiction by means of the corporate entity, when they could not interpose the same shield as a defense against substantive liability. The cases hold that where a corporate officer has personally engaged in activity for which individual liability may attach – as under the NJLAD --  then the corporate shield may not be used to defend against personal jurisdiction.  *See, e.g., Wright v. Xerox,* 882 F. Supp. 399 (D.N.J. 1995) (NJLAD discrimination case rejecting argument that an individual defendant cannot be subjected to the personal jurisdiction of the Court because their actions were pursuant to their duties as employees);  *Educational Testing Serv. v.* Katzman, 631 F Supp. 550, 559 (D.N.J. 1986)(an individual defendant's status as an employee will not nullify the ability of his contacts with the forum to create amenability to

20

suit there); *Imps. Serv. Corp. v. Aliotta*, 2024 U.S. Dist. LEXIS 96286 (D.N.J. May 30, 2024).

### 2.    There is specific jurisdiction under the "traditional" test.

Specific jurisdiction exists under the "traditional test" where: 1) a defendant has purposefully directed activities at the forum state; and (2) the litigation arises out of or relates to at least one of these activities.  If the first two requirements are met, a court may consider whether the exercise of jurisdiction otherwise comports with fair play and substantial justice.  *See, e.g., Gentex Corp.,* 978 F. Supp. 2d at 396; *Rohde v. Unitarian Universalist Ass'n*, 2025 U.S. Dist. LEXIS 131763, *6 (E.D. Pa. July 11, 2025).  A defendant's physical presence in the forum is not required.  Activities targeted at the forum may be both in person and virtual.  *E.g., Law,* 2023 U.S. Dist. LEXIS 32414, at *12.

Defendant Stankey purposefully directed activities to the forum state of New Jersey.  Without limitation:

- CEO Stankey demonstrated his preference for younger employees by championing the TDP program located in Middletown, which both he and AT&T have described as a program to develop young talent.

- CEO Stankey met with employees several times in New Jersey during the 2023 and 2024.

- CEO Stankey authorized and directed the implementation of the HWWW initiative, which he intended and expected to reduce the

number of older employees across every state in the United States including New Jersey.

- CEO Stankey was the architect of the HWWW initiative, pursuant to which the Bedminster, New Jersey office was reduced by about seventy-five percent (75%).

- CEO Stankey intended and expected that the HWWW initiative would reduce the number of older employees. Plaintiff intends to adduce evidence that CEO Stankey instructed his Direct Reports to look at the data and come up with a plan that did so in New Jersey.

- When CEO Stankey directed managers that the company needed younger employees to carry it into the future and told them that the HWWW initiative was the opportunity to "say goodbye" to the older employees, it is reasonable to infer that he was aware and intended that his message would be heard by managers who worked in New Jersey and/or managers whose subordinates worked in New Jersey.

- Employees who worked in New Jersey were forced to relocate out of New Jersey, pursuant to the company initiative that CEO Stankey authorized and directed.

- CEO Stankey met in person with employees in New Jersey and expressed to them his preference for younger employees and a hostility to older employees.

  o On September 18, 2023, CEO Stankey told them he was an "old guy" who was not going to work for much longer, while praising the wonderful looking young employees.

  o On or about November 13, 2023, CEO Stankey met with employees in Bedminster and told them that the company was underrepresented in the number of employees in their twenties and thirties.

  o In or about June, 2024, CEO Stankey met with members of the TDP in New Jersey, and posted a link to an AT&T

22

Facebook page on which was posted a photograph of him meeting with young people and a statement "The day was a great opportunity to build connections and celebrate the work being done by the young professionals who will lead future innovations at AT&T."

- CEO Stankey communicated his preference for younger employees and hostility against older workers to employees in New Jersey other than in person.

  o CEO Stankey told employees from New Jersey who were invited to participate in an interactive web meeting that the company needed younger employees, and the HWWW was an opportunity to "say goodbye" to the older employees.

  o CEO Stankey on or about June 23, 2023, posted to his followers on various social media, which undoubtedly included many managers who worked in New Jersey and/or had subordinate employees who worked in New Jersey, that "Young professionals today are more likely to move around to a variety of jobs, working on a variety of projects in a variety of places…

  o On or about July 28, 2023, CEO Stankey sent a message to managers that praised the former Head of Human Resources for her "passion for mentoring young people."

  o CEO Stankey posted on his LinkedIn page about his September, 2023, visit to Middletown, and wrote that he "enjoyed spending time with members of our Talent & Development program – the young minds helping shape the future of our network…"

- CEO Stankey expressed to employees in New Jersey hostility against older employees.

- CEO Stankey's age-biased statements and conduct was offensive to and upset employees in New Jersey.

23

Plaintiff's claims arise from or relate to Defendant Stankey's contacts in the state of New Jersey:

CEO Stankey expressed his belief that older employees were less likely to move and authorized a company policy (HWWW) to force employees in New Jersey and elsewhere to relocate.  Plaintiff's forced relocation from New Jersey to Atlanta (an adverse action in itself) arose from the company policy that CEO Stankey authorized.

Plaintiff's Complaint alleges that younger employees who reported to Ms. Chin were not forced to relocate to Atlanta, and she points to a recent graduate of the TDP, which CEO Stankey championed, as being treated more favorably because of his age.

When Plaintiff "declined" the "offer" to relocate out of New Jersey – as Stankey expected and intended – she was "surplussed" and her employment in New Jersey terminated pursuant to the company policy CEO Stankey authorized and which he directed be used to "say goodbye" to older employees.

Plaintiff heard the age-based hostile statements CEO Stankey expressed and they were greatly offensive and upsetting to her, and detrimentally affected the terms and conditions of her employment in New Jersey.  CEO Stankey's hostility contributed to the hostile work she was subjected in New Jersey and on which she has brought a claim.

24

In sum, CEO Stankey's contacts in New Jersey are related to her claims and sufficient to establish minimum contacts.  *See, e.g., Law v. Virtus Partners Holdings, LLC,* 2023 U.S. Dist. LEXIS 32414 (D.N.J. Feb. 27, 2023)(finding that contacts including, e.g., virtual/electronic and in person communications were related to the NJLAD aiding and abetting claims brought against a non-resident individual who had no contacts with New Jersey associated with residency and worked out of state).

### 3.    Alternatively, Specific Jurisdiction Exists Under The Calder Effects Test.

Alternatively, Plaintiff can show specific jurisdiction under the "effects" test, recognized by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984).  The Calder effects tests "allows a plaintiff to demonstrate personal jurisdiction if he or she shows: 1) [t]he defendant committed an intentional tort; 2) the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and 3) [t]he defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity."  *Rohde,* 2025 U.S. Dist. LEXIS 131763 at *6.

First, Stankey's instruction to unlawfully discriminate that resulted in Plaintiff's termination and his age-based hostile conduct creating a hostile work environment are considered to be "intentional torts" for purposes of the effects test.

25

*See, e.g., Shanahan v. Ethan Allen Retail, Inc.*, 2021 U.S. Dist. LEXIS 169707, at *13-14 (E.D. Pa. Sep. 8, 2021). Second, Plaintiff felt the brunt of Stankey's conduct in New Jersey, where she was subjected to a hostile work environment and her employment was terminated. Third, the focus of Stankey's discriminatory conduct was in New Jersey, where the effect of his discriminatory conduct occurred.

Plaintiff has established personal jurisdiction under the effects test. *See, e.g., Wright v. Xerox Corp.,* 882 F. Supp. 399, 410 (D.N.J. 1995) )(rejecting application of fiduciary shield doctrine and denying motion to dismiss NJLAD claim against individual manager in chain of command who lived and worked in Texas).

4. **Stankey has made no showing that the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice.**

Once minimum contacts have been established, as they have been here, jurisdiction is presumptively constitutional and the moving party "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz* , 471 U.S. 462, 477 (1985) (internal quotations omitted). Factors to be considered whether the exercise of jurisdiction otherwise comports with fair play and substantial justice include: . "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, [and] the

interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social justice." *Id.* at 477.

Stankey has not addressed any of these factors and does not meet his burden. He has articulated no hardship whatsoever in defending a suit in New Jersey.

The Court has explained why it is reasonable that a defendant in an NJLAD discrimination case be required to travel to the site of the harm (i.e., where the plaintiff-employee worked):

> Few policies can be characterized as more fundamental
> than that embodied in NJLAD.  It serves the interests of
> New Jersey and her sister states to require racial
> discrimination to be litigated in the forum where the
> harm is suffered.  Every state has an interest in protecting
> its citizens from this grievous social wrong when
> perpetrated by the non-resident managers of large
> corporations.

*Wright,* 882 F. Supp. 399 at 410 (D.N.J. 1995).

**5.    In The Alternative, The Court Should Permit Plaintiff To Conduct Jurisdictional Discovery Simultaneously With Merits Discovery.**

The Court may in its discretion allow jurisdictional discovery before deciding whether it has personal jurisdiction over a defendant. *E.g., Mass Sch. Of L. at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1977). Generally, "jurisdictional discovery should be allowed unless the plaintiff's claim is clearly frivolous."  Id. at 1042 (internal quotation marks omitted).

27

If the Court were not to deny Stankey's Motion on the papers submitted, Plaintiff should be permitted the opportunity to conduct jurisdictional discovery. As set forth herein, the allegation that Stankey "was not involved" in the adverse actions to which Plaintiff was subjected is certainly contested. Moreover, his Declaration has not been subject to scrutiny. At this stage, it should not be considered. To the extent that Plaintiff's allegations regarding Stankey's state of mind regarding what he was aware of and what he intended are not accepted as true (which they should be at this stage), they are squarely in dispute and Plaintiff should be permitted to depose him.

Further, evidence of the CEO's discriminatory bias and conduct both infecting and directly involved in the actions against Plaintiff is relevant and discoverable evidence in Plaintiff's action against AT&T. Plaintiff intends to depose Stankey regardless of the disposition of his Motions to Dismiss, and her counsel is willing to do so in Texas or remotely by Zoom. Jurisdictional discovery pending disposition of his Rule 12(b)(2) Motion will not subject Stankey to any burden that he would not already face under the subpoena powers of the Court in the action against AT&T.

**B.    Plaintiff Has Stated A Claim Against Defendant Stankey For Aiding And Abetting AT&T's Violation Of The NJLAD.**

The NJLAD prohibits individuals from aiding, abetting, inciting, compelling or coercing any actions prohibited by the NJLAD, including age discrimination.

N.J.S.A. § 10:5-12(e).  Individual liability under the NJLAD may be shown by "active and purposeful conduct."  *Tarr v. Ciasulli*, 18 N.J. 70, 84 (2004).  To state an aider and abettor claim under the NJLAD, Plaintiff must allege that (1) the party whom the defendant aids must have committed a wrongful act causing injury; (2) the defendant must be generally aware of his role in the illegal activity when he provides the assistance; and (3) the defendant must "knowingly and substantially assist the principal violation."  *Id.*

Plaintiff's Complaint clearly states a claim against defendant Stankey for aiding and abetting AT&T in discriminating against Plaintiff because of her age. While Defendant Stankey argues that Plaintiff has set forth only conclusory allegations of aiding and abetting, it is obvious that the paragraphs he cites are conclusory summarizing statements of particular factual allegations.

Plaintiff has alleged that AT&T committed wrongful acts causing her injury. Defendants AT&T do not contest that Plaintiff has stated a claim against the company for age discrimination in violation of the NJLAD in connection with a) her forced relocation from New Jersey to Atlanta; b) her "surplus"/termination of employment; and c) an age-based hostile work environment.

As to Plaintiff's forced relocation and termination:  CEO Stankey was generally aware of his role in AT&T's wrongful conduct when he aided and abetted it.  As to Plaintiff's forced relocation, the HWWW that Stankey approved and

promoted <u>was</u> for forced relocation. As to Plaintiff's termination, Plaintiff has pleaded that Stankey intended the HWWW to reduce the number of older employees. CEO Stankey expressed his belief that younger workers were more likely to move, and authorized the HWWW, which coupled a return to office requirement with the consolidation of workplaces. CEO Stankey expressed his expectation that the HWWW would result in older workers leaving voluntarily. Older workers were less likely to relocate and more likely to retire and take the severance offered. If they did not, the policy called for their surplus and termination. AT&T's age discriminatory forced relocation and termination of Plaintiff's employment was exactly what CEO Stankey intended with the HWWW.

CEO Stankey knowingly and substantially assisted the violation because he was the company's CEO and he authorized and directed it. He was crystal clear: He openly told those below him that the company needed younger employees and directed them to use the HWWW initiative as a opportunity to "say goodbye" to them. When the CEO speaks, everyone listens. They did so here when they forced Plaintiff to relocate out of New Jersey and terminated her employment because of her age.

As to the age-based hostile work environment claim: Defendant Stankey does not challenge it. (See Stankey Brief at p. 20, asserting that "Ms. Lopez does not plead facts showing that Mr. Stankey was 'generally aware of his role' or that

30

he 'knowingly and substantially assist[ed] in Ms. Lopez's relocation, surplus section, or termination.") Nor could he rightfully do so.  Plaintiff's complaint alleges that CEO Stankey contributed to her age-based hostile work environment and she pleaded specific factual examples of the way in which he did so.

## VI.   CONCLUSION

Imagine if instead of hearing a company's CEO say that the company needed younger employees, a CEO said that the company needed White employees to carry them forward to the future.  Or if the CEO explained to an invited audience that included many female employees that a workforce reduction program was an opportunity to "say goodbye" and that the intended and expected resulting loss of women from the company workforce was a good thing because the company needed more men working there.  Or if the CEO championed a company program located in its New Jersey office to develop Protestant employees, while standing before an audience in New Jersey of Muslim employees and expressing hostile stereotypes about them.

Would the CEO be insulated from liability under a statute that specifically provides for individual liability for aiding and abetting because they were in the most influential position in the company?  No.  Would the CEO be insulated from liability because his direction was to discriminate against all of the company's say, non-White, female, Muslim,  employees rather than a particular one?  No.  Would a

31

court in New Jersey lack the authority to enforce the state's Law Against Discrimination under which a CEO would be individually liable for his conduct done in a corporate capacity because his contacts in New Jersey were done in a corporate capacity?   No, such result would be anomalous, indeed, and would thwart the purpose of the NJLAD in imposing individual liability.  Any CEO who did these things would reasonably anticipate being haled into a court in New Jersey to answer for his wrongful conduct.

Should the result be any different because the plaintiff was discriminated against because of her age, rather than her race, sex, religion, etc.?  Of course not. Defendant John Stankey's Motion should be denied.

In the alternative, Plaintiff requests the opportunity to conduct jurisdictional discovery.

**CONSOLE MATTIACCI LAW OFFICES**

By: _____

Susan Saint-Antoine, Esquire
Kevin Console, Esquire
Holly W. Smith, Esquire
110 Marter Ave, Suite 502
Moorestown, NJ 08057
(856) 854-4000